O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH J. PHELAN, | Case No. SACV 15-0216-KES |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| v. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Joseph Phelan appeals the final decision of the Administrative Law Judge ("ALJ") denying his applications for benefits.  The Court concludes that the ALJ lacked sufficient information to determine Plaintiff's residual functional capacity ("RFC").  The Commissioner's decision is therefore REVERSED and REMANDED.

## I.

## BACKGROUND

Plaintiff filed an application for Supplemental Security Income ("SSI")

on July 31, 2013, alleging disability commencing April 24, 2013.[1]  (AR 130-138.)

On May 22, 2014, a hearing was held before Administrative Law Judge Christine Long, at which Plaintiff testified but was not represented by counsel. (AR 33-70.)  On July 18, 2014, the ALJ published an unfavorable decision. (AR 18-32.)  The ALJ found that Plaintiff has four "severe" impairments: (1) mood disorder, (2) personality disorder, (3) history of methamphetamine abuse in early remission, and (4) history of tardive dyskinesia.  (AR 23.) According to the Merriam Webster dictionary, tardive dyskinesia is "a neurological disorder characterized by involuntary uncontrollable movements especially of the mouth, tongue, trunk, and limbs and occurring especially as a side effect of prolonged use of antipsychotic drugs."  See http://www.merriam-webster.com/dictionary/tardive%20dyskinesia.

The ALJ found that Plaintiff has the RFC to perform "a full range of work at all exertional levels" but with the following non-exertional limitations:

> Understand, remember and carry our moderately complex tasks – defined as job with special vocational preparation in the 3 to 4 range; no work with high production quotas or rapid assembly line work; cannot be responsible for the safety of others; and no climbing ladders, ropes and scaffolds.

---

[1]     The ALJ noted that this disability onset date corresponded with when Plaintiff was released from jail.  (AR 26.)  Case notes from the parole clinic dated July 19, 2013, say that Plaintiff was released from custody "4 days ago" at which point he "began to drink and use methamphetamine" and "has not slept in 4 days."  (AR 258.)  He received counselling, and later testified that he has been sober since July 18, 2013.  (AR 49, 52.)  Elsewhere, he gave December 8, 2013, as the starting date of his sobriety.  (AR 280.)

2

(AR 25.)  At the hearing, a vocational expert testified that a person of Plaintiff's age, education, work experience and RFC would be able to perform jobs that exist in significant numbers in the national economy, including the jobs of parking lot signaler, floor waxer and laundry worker.  (AR 28-29, 66-67.)  As a result, the ALJ found Plaintiff not disabled.  (AR 29.)

## II.

## ISSUES PRESENTED

The parties dispute only one issue: "whether the ALJ's RFC assessment is supported by substantial evidence and free of legal error."  (Joint Stipulation ["JS"] 4.)  Specifically, Plaintiff contends that the ALJ's failure to include in the RFC any exertional limitations attributable to Plaintiff's tardive dyskinesia was error.  (JS 5.)

Plaintiff contends that the ALJ improperly discounted the opinion of treating neurologist, Dr. Saheil Aboutalib, who opined in June 2014 that Plaintiff's tardive dyskinesia was "disabling." [2]  (JS 6, citing AR 316.)  Dr. Aboutalib's entire opinion letter states as follows:

> Mr. Joseph Phelan has been diagnosed with tardive
> dyskinesia at Harbor-UCLA Neurology clinic.  He has
> involuntary, painful, contractions of his neck muscles
> that are debilitating and difficult to treat.  His condition is
> currently disabling as he cannot keep his head from
> moving forcefully and constantly.  He is currently in the
> process of transferring his care … to Orange County.
> Please feel free to contact me with questions.

---

[2]    Plaintiff testified that he saw a neurologist three times prior to the May 22, 2014, hearing.  (AR 38.)  Dr. Aboutalib's opinion letter is dated June 18, 2014.  The administrative record contains no actual treatment records from Dr. Aboutalib or any other physician at the Harbor-UCLA Medical Center.

1  (AR 316.)

2      The ALJ found Dr. Aboutalib's letter "not persuasive" for four reasons,

3  as stated in her written opinion with **[numbers]** added:

4          Physically, the claimant has tardive dyskinesia.  (Exhibit

5          9F/1 [AR 316].)  However, **[1]** his involuntary

6          movements improved since sobriety and on medication.

7          For example, the claimant admitted that when he

8          stopped using cocaine, the twitching stopped (Exhibit

9          2F/23 [AR 266[3]]).  **[2]** A staff psychiatrist from

10         [California Department of Corrections] commented that

11         the claimant's neck movements do not appear to be

12         tardive dyskinesia but more like a muscle movement

13         disorder after binging on cocaine (Exhibit 7F/10 [AR

14

15         [3]      The social worker's case notes from the parole clinic dated

16  September 11, 2013, say:  "Alert and oriented.  Involuntary movement in neck
    and Psychiatrist unsure if side effect of meds or drug use.  Admits used cocaine

17  last month but twitching stopped after one week and began following 2 weeks
    on Risperidone.  Admits not taken meds z1 week and continues to move neck

18  without ability to stop.  MD evaluated and referred to Neurology."  (AR 266.)
    The psychiatrist's notes from the same day say:  "Pt was in jail til mid July.

19  When he got out he did rock cocaine – unsure if it was contaminated for a
    week.  He then started having neck movements.  He was not taking any psych

20  meds.  Then on July 31, he was prescribed Celexa and Abilify.  He could not
    fill the Abilify.  He came back Aug. 13th and was given Risperidone ….  He

21  thinks about 10 days ago he started neck movements after 4-5 days he stopped
    the Risperidone.  He continues to have neck movements.  Jerking mild, worse

22  at times.  At times movements less.  He does not have any jaw movements or
    tongue thrusting.  No puckering of the mouth.  …  Referral to clinic County

23  Harbor UCLA to see neurologist.  Concern is as to what he took since neck
    movements started after he took the illicit cocaine.  R/O ["rule out"] tardive

24  dyskinesia."  (AR 267.)

25

26

27

28

312[4]])．Although a counselor [at Plaintiff's residential treatment center], Christina Saenz, reported the claimant's difficulties attending groups, completing job functions and frequent breaks to regroup throughout the day due to muscle spasms (Exhibit 8F/1 [AR 315]), **[3]** a consultative examiner, Dr. Godes, did not observe any "constant involuntary movement" (Exhibit 3F/3-4 [AR 285-86].)  Therefore, the [ALJ] finds that a neurologist's [*i.e.*, Dr. Aboutalib's] conclusory statement that claimant's involuntary neck movement is disabling has [sic] is not persuasive because **[4]** the extent and consistency of the involuntary movements is not well documented.

(AR 27.)

### III.

### DISCUSSION

An ALJ must provide "clear and convincing reasons" for rejecting the uncontradicted opinion of an examining physician.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, "clear and convincing" evidence means evidence "of such convincing force that it demonstrates, in contrast to the opposing evidence, a high probability that the facts of which it is proof are true."  Hangarter v. Paul Revere Life Ins. Co., 236 F. Supp. 2d 1069, 1087 (N.D. Cal. 2002) (citing federal jury instructions).  To reject the contradicted

---

[4]       The same psychiatrist's case notes from the parole clinic dated April 2, 2014, say:  "Pt's neck movements do not appear to be TD.  More like a muscle movement disorder.  Pt says he got it within a week of binging on cocaine he could have had a possible stroke after drug use. … Pt. referred to see neurologist for his movement disorder."  (AR 312.)

opinion of an examining physician, an ALJ must provide "specific and legitimate reasons that are supported by substantial evidence in the record." Lester, 81 F.3d at 830-31 (citation omitted).  "Substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014).

Here, no medical evidence expressly contradicts Dr. Aboutalib's opinion about the severity of Plaintiff's tardive dyskinesia.  Accordingly, the Court applies the "clear and convincing" standard.

## A.   The ALJ's First Reason for Discrediting Dr. Aboutalib is Not Clear and Convincing.

The ALJ cites a treatment note dated September 11, 2013, for the premise that Plaintiff's twitching stopped after he stopped using cocaine.  (AR 27, citing AR 266.)  In fact, that treatment note says, "Admits used cocaine last month but twitching stopped after one week *and began following 2 weeks on Risperidone*."  (AR 266 [emphasis added].)

In September 2013, that psychiatrist, Dr. Mary Poonen, made the following observations about Plaintiff's involuntary movements:  "Jerking mild, worse at times.  At times movements less."  (AR 267.)  In February 2014, Dr. Poonen wrote, "PT still having neck movements less when standing.  Some lip pursing also."  (AR 304.)  In April 2014, long after Plaintiff's date of sobriety, Plaintiff's social worker noted, "involuntary movements continue but does have brief episodes of relief.  Movement present during session."  (AR 314.)  Dr. Aboutalib's letter is dated June 18, 2014.  (AR 316.)

There is also some information about how Plaintiff's neck and head movements have changed over time in Plaintiff's own testimony.  For example, Plaintiff testified "when I got out [of jail in 2013], I started noticing an unfamiliar movement in my neck and it wasn't as bad as it is today [May 2014]."  (AR 56.)  Plaintiff also testified "I do not drive. … I ride a bike or

take the bus. [5]  Sometimes I can't – it's difficult to ride the bike, but sometimes I can put my hands on the handlebars and crunch my head into my shoulder blades and it helps from rocking."  (AR 46-47.)  Plaintiff rode his bike to the hearing.  (AR 47.)  The ALJ, however, found that Plaintiff was "not fully credible" (AR 27), and Plaintiff has not challenged that finding in this appeal.

Even disregarding Plaintiff's testimony, the note at AR 266, read in light of later observations in the record, simply does not support the conclusion that Plaintiff's condition has gotten better over time due to Plaintiff's sobriety.

**B.**   **The ALJ's Second Reason for Discrediting Dr. Aboutalib is Not Clear and Convincing.**

The ALJ cites a treatment note dated April 2, 2014, from Dr. Poonen questioning whether Plaintiff's involuntary movements are caused by tardive dyskinesia or some other impairment.  (AR 27, citing AR 312.)  Dr. Poonen's questioning does not challenge or contradict Dr. Aboutalib's opinion.  It was Dr. Poonen who referred Plaintiff to a neurologist (*i.e.*, Dr. Aboutalib) months earlier in order to determine if the correct diagnosis was tardive dyskinesia. (AR 267.)  Dr. Aboutalib confirmed that it was.  (AR 316.)  The ALJ accepted this diagnosis.  (AR 23.)  Thus, there is no longer any dispute over Plaintiff's diagnosis.  The only dispute is over whether Plaintiff's tardive dyskinesia limits his physical abilities in ways that should have been reflected in the RFC.

**C.**   **The ALJ's Third Reason for Discrediting Dr. Aboutalib is Not Clear and Convincing.**

The ALJ found Dr. Aboutalib's opinion inconsistent with Dr. Godes's report.  (AR 27, comparing AR 285-86 and AR 316.)  Inconsistency with other medical findings is a legitimate reason for rejecting a treating physician's

---

[5]      On November 1, 2013, Dr. Godes noted that Plaintiff drove to his appointment.  (AR 284.)

7

1   opinions.  Morgan v. Commissioner of the SSA, 169 F.3d 595, 602 (9th Cir.

2   1999) ("Inconsistency between [examining] Dr. Grosscup's and [treating] Dr.

3   Reaves's conclusions provided the ALJ additional justification for rejecting Dr.

4   Reaves's opinion"); 20 C.F.R. § 404.1527(c)(4) ("Generally, the more

5   consistent an opinion is with the record as a whole, the more weight we will

6   give to that opinion").  Where inconsistency is cited as the reason for

7   discrediting a treating physician's opinion, however, the inconsistency must be

8   specific and real.  McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989)

9   (rejection of treating physician's opinion on the grounds that it was contrary to

10   clinical findings in the record was "broad and vague, failing to specify why the

11   ALJ felt the treating physician's opinion was flawed").

12        Here, Dr. Godes examined Plaintiff on November 1, 2013, and

13   submitted a report noting observations about Plaintiff's general physical

14   condition with sections addressing specific body parts, including Plaintiff's

15   head and neck.  (AR 285-86.)  Nowhere in that report did Dr. Godes indicate

16   that he observed Plaintiff experiencing "constant involuntary movement,"

17   comparable to what Dr. Aboutalib's opinion letter reports.  (Cf., AR 27, AR

18   285-86 and AR 316.)

19        Plaintiff argues that this is not a true inconsistency, because there is no

20   evidence that anyone told Dr. Godes about Plaintiff's tardive dyskinesia

21   diagnosis, such that looking for the symptoms of that condition was beyond

22   the scope of his exam.   (JS at 7.)  In response, the Commissioner points out

23   that Dr. Godes was asked to examine Plaintiff and opine about his physical

24   limitations, if any.  Dr. Godes noted, "The claimant is being evaluated for any

25   physical problem."  (AR 284.)  In the course of such an evaluation, if he had

26   observed something as unusual as "debilitating," "constant" and "forceful"

27   involuntary neck or head movements, the Commissioner contends that he

28   would have so noted in his report.  (JS at 11.)

Plaintiff also argues that Dr. Godes' report was the result of only a "limited examination," such that his failure to mention Plaintiff's involuntary movements is not an inconsistency that justifies the ALJ's discounting Dr. Aboutalib's opinions.  (JS at 8.)  The Commissioner again counters that even during a limited examination, if Plaintiff were truly experiencing "constant" involuntary movements so "forceful" as to be "disabling," as stated in Dr. Aboutalib's letter (AR 316), then Dr. Godes would likely have noted them.

Ultimately, the Court is unwilling to conclude that Dr. Godes's silence on the issue is equivalent to an opinion that contradicts Dr. Aboutalib's opinion.  Dr. Godes may have observed the movements and assumed that they were symptoms of Plaintiff's *mental* impairments, and thus beyond the scope of his *physical* exam.  Speculating as to what Dr. Godes observed, but failed to note, cannot provide a "clear and convincing" basis for rejecting Dr. Aboutalib's opinion concerning the severity of Plaintiff's tardive dyskinesia.

**D.**   **The ALJ's Fourth Reason for Discrediting Dr. Aboutalib Improperly Relies on an Incomplete Record that the ALJ Offered to Augment.**

Typically, the lack of medical evidence supporting a treating physician's opinion is a legitimate basis to reject it.  See, e.g., Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings"); 20 C.F.R. § 404.1527(c)(3) (in determining the weight to give to the opinion of a treating physician, the ALJ should consider factors such as the degree to which the opinion is supported by relevant medical evidence).

Here, the ALJ correctly called Dr. Aboutalib's opinions about the severity of Plaintiff's condition "conclusory," noting that the "extent and consistency of the involuntary movements is not well documented."  (AR 27.) Dr. Aboutalib does not, for example, describe how many times he saw

Plaintiff, or over what period of time.  Dr. Aboutalib does not describe what range of involuntary movements he actually observed, such that the ALJ or vocational expert could consider whether such movements might impair Plaintiff's job-related functioning.  Dr. Aboutalib does not describe if Plaintiff's condition changes over time or varies depending on Plaintiff's medications or other circumstances that could be taken into account in a work environment. Dr. Aboutalib does not describe what tasks, if any, he observed Plaintiff have difficult performing, or any tests he conducted to assess how Plaintiff's involuntary movements might affect his functionality (*e.g.*, asking Plaintiff to read, write, walk, carry objects, stack blocks, etc.).  Dr. Aboutalib does not identify any specific tasks or general kinds of tasks that, in his opinion, Plaintiff cannot perform.[6]

At the hearing, however, Plaintiff testified that he had seen a neurologist (presumably Dr. Aboutalib) three times.  (AR 38.)  He also testified, "They were supposed to send the documents.  This is wrong."  (AR 41.)  The ALJ noted that she did not have any records from his neurologist, but she repeatedly offered to obtain them.  (AR 37, 39, 40 ["I can order those records for you"], AR 41 ["I need medical records documenting conditions so I'm going to have to order those records"], AR 42, 53 ["He's had three appointments, but I don't have those records. … But he does have significant symptoms …"], AR 59 ["I need to get those records, so I'm going to have to order them …"], AR 61 ["I really need to get it to give you a fair decision"], AR 68 ["What I will do is get those records for you …"]).  The medical expert who testified at the hearing, a psychologist, stated, "when the medication is stopped, that that is what is causing it … then it should mitigate and …

---

[6]     The ALJ excluded from the RFC certain tasks requiring balance, *i.e.*, "climbing ladders, ropes and scaffolds."  (AR 25.)

1   sometimes it could cause some permanence.  But at any rate, I don't have any
2   medical evidence that this side effect would prevent him from functioning."
3   (AR 51, 58-59.)

4      It is unclear how the ALJ requested Plaintiff's treatment records from
5   the Harbor-UCLA Medical Center, but apparently all that she received in
6   response was Dr. Aboutalib's 1-page letter.  (AR 316.)  The ALJ's decision
7   essentially rejects this letter for being unsupported by underlying treatment
8   records – but the ALJ had already assured Plaintiff that she was undertaking
9   the task of obtaining those records.

10     In determining disability, the ALJ "must develop the record and
11  interpret the medical evidence."  Howard v. Barnhart, 341 F.3d 1006, 1012
12  (9th Cir. 2003).  That duty is heightened when a claimant proceeds without
13  counsel.  Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003).  That duty is
14  triggered when, among other circumstance, the record is inadequate to allow
15  for proper evaluation of the evidence.  Mayes v. Massanari, 276 F.3d 453, 459-
16  60 (9th Cir. 2001).  "Absent a reliable medical opinion regarding plaintiff's
17  physical impairments and related functional limitations, the ALJ lacked a
18  necessary foundation on which to make a proper determination of whether
19  plaintiff has an impairment that precludes her from gainful employment."
20  Khan v. Colvin, 2014 U.S. Dist. LEXIS 86558, *15-16 (C.D. Cal. 2014)
21  (remanding for further development of the record).

22     Here, the ALJ repeatedly admitted at the hearing that the record was
23  inadequate to allow her to evaluate Plaintiff's tardive dyskinesia.  Obtaining
24  the 1-page letter from Dr. Aboutalib, which she then discredited as
25  unsupported, did not change the inadequate nature of the record.

26     On remand, the ALJ should obtain Plaintiff's treatment records from
27  Harbor-UCLA Medical Center and reevaluate Dr. Aboutalib's opinion
28  concerning the severity of Plaintiff's tardive dyskinesia in light of those

records.  The ALJ will then need to determine if any exertional limits should be added to the RFC and, if so, obtain new testimony from a vocational expert concerning available jobs matching Plaintiff's RFC.[7]

### CONCLUSION

Accordingly, for the reasons stated above, IT IS ORDERED that, pursuant to sentence four of 42 U.S.C. § 405(g), judgment be entered reversing the decision of the Social Security Commissioner and remanding this matter for further proceedings consistent with this Memorandum Opinion and Order.

Dated: <u>November 10, 2015</u>

*Karen E. Scott*
_____
KAREN E. SCOTT
United States Magistrate Judge

---

[7]     The ALJ may determine that no exertional limits are indicated.  It seems reasonable that someone physically able to ride a bicycle would be able to meet the exertional demands of jobs such as a floor waxer, laundry worker or parking lot signaler.  Nevertheless, the vocational expert was never asked any hypothetical questions assuming even mild, persistent, involuntary head and neck movements.  (AR 66-67.)